IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


BUNZ V. A.C. LIGHTNING PROTECTION CO.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


NATHANIEL T. BUNZ, APPELLEE,

V.

A.C. LIGHTNING PROTECTION COMPANY, INC., AND
AMERICAN INTERSTATE INSURANCE COMPANY, APPELLANTS.


Filed January 5, 2021.    No. A-20-274.


Appeal from the Workers' Compensation Court: J. MICHAEL FITZGERALD, Judge. Affirmed.

Kelsey J. Paumer and Kathryn L. Hartnett, of Prentiss Grant, L.L.C., for appellants.

Danny C. Leavitt, of Salerno & Leavitt, and Terrence J. Salerno for appellee.


PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

MOORE, Judge.

## INTRODUCTION

A.C. Lightning Protection Company, Inc. (A.C. Lightning) and its workers' compensation insurance carrier American Interstate Insurance Company (collectively the Appellants) appeal from the order of the Nebraska Workers' Compensation Court, which awarded Nathaniel T. Bunz temporary total disability benefits and future medical care for an injury he suffered in an accident arising out of and in the course of his employment with A.C. Lightning. For the reasons set forth herein, we affirm.

## BACKGROUND

Bunz was an employee of A.C. Lightning from November 2016, through February 2018, working as an installer. On October 12, 2017, he suffered a low-back injury in an accident arising

out of and in the course of his employment with A.C. Lightning. Subsequently, on May 26, 2018, he experienced severe back pain requiring a visit to the emergency room while moving a desk in his residence. The Appellants contend that because the May 2018 desk-moving incident was an independent intervening cause of Bunz' current condition rather than a recurrence of his 2017 work-related injury, they are not responsible for his need for future medical treatment.

On October 22, 2018, Bunz filed a petition in the compensation court seeking benefits. Bunz alleged a work-related accident occurring on or about October 13, 2017 (amended at trial to October 12) and resulting in injury to his low back and right hip with pain radiating into his leg and groin. Bunz alleged that the matters in dispute were the extent of his disability, payment of medical bills, temporary total and permanent partial disability benefits, and other benefits as allowed by the Nebraska Workers' Compensation statutes.

Trial was held before the compensation court on November 8, 2019. The court heard testimony from Bunz, and it received numerous medical records, bills, and other documentary exhibits offered by the parties, including the deposition of one of Bunz' treating physicians, Dr. John McClellan, and a deposition of Bunz (an exhibit to McClellan's deposition).

Prior to hearing Bunz' testimony, the compensation court inquired, among other things, about "[w]hat periods of temporary" Bunz was claiming. In response to the court's inquiry, the following exchange then took place:

[BUNZ' ATTORNEY]: Judge, he was temporarily -- there was seven-point-something weeks -- I don't recall, but that has been paid.

THE COURT: I know, but I have to. . . [.]

[BUNZ' ATTORNEY]: She's [A.C. Lightning's attorney] got it in her exhibit, your Honor.

. . . .

[BUNZ' ATTORNEY]: I'm thinking [exhibit] 15 [upon being provided with this reference by A.C. Lightning's attorney].

THE COURT: All right. What do you claim for temporary?

[BUNZ' ATTORNEY]: In terms of the time missed, your Honor?

THE COURT: Yeah.

[BUNZ' ATTORNEY]: The number of weeks that were paid.

THE COURT: So temporary is all paid?

[BUNZ' ATTORNEY]: To this point, yes, your Honor.

The discussion then turned to other matters, and after completing that discussion, the compensation court summed up its understanding of the issues before it, stating, "Let me run through my own notes in my head. You got hurt on the job. We got the temporary agreed to for what you claim as of today . . . have been paid?" After Bunz' attorney responded affirmatively, the court proceeded with its summation of the issues. Other than providing Bunz' attorney with the reference to the relevant exhibit, A.C. Lightning's attorney did not make any statements during either of these exchanges, and the court did not direct any questions toward her with respect to the payment of temporary total disability.

Bunz was 25 years old at the time of trial. He is 6 feet 4 inches tall and weighs between 350 and 360 pounds. Bunz lifted weights before the accident, and played football in high school. Bunz testified about his work for A.C. Lightning, including the specific tasks he was engaged in on the day of his injury. Bunz described A.C. Lightning's business as installing lightning protection on buildings, consisting of a structure on the building's roof connected by cable to rods placed in the ground around the building. The rods are "hammer[ed]" into the ground using a "ground pounder." On October l2, 2017, Bunz was part of a crew installing lightning protection on a three-story hotel in Missouri. It was raining and muddy that day, and it took 2 hours to install 11 ground rods. Bunz testified that the muddy ground conditions caused him to slip and sink into the mud at times, but he did not fall. When Bunz finished working, he had to drive 5 to 6 hours to get home. Bunz only noticed what he thought was "regular soreness from working" when he got home, but the next morning, he felt like he had "strained" his back.

On October 13, 2017, Bunz was examined by Dr. James D. Crew (a doctor in his regular doctor's office) for lower right back pain. In his notes, Crew wrote, "[Bunz] presents to office with lower [right] back pain for the past 24 hours after working yesterday. Works outside and slipped in the mud somewhat 2 days ago[,] but no specific pain with the slip. Used [T]ylenol and ice last night without much relief." When Crew examined Bunz' lumbar spine, Bunz exhibited decreased range of motion, tenderness, and pain with no swelling, edema, deformity, laceration, or spasm. Crew's primary diagnosis was "[a]cute right-sided low back pain without sciatica." Crew prescribed a muscle relaxer and instructed Bunz to use heat, ice, and Tylenol as needed.

On October 16, 2017, Bunz was examined by his regular family physician, Dr. Robert C. Drvol. During that appointment, Bunz complained of right lower back pain that had been "sending shocks" to his right leg for 4 days. Bunz also had tingling but no weakness in his leg. Bunz reported that the pain seemed to start when he got home from work the week prior and seemed to be worsening. After a physical examination of Bunz, Drvol assessed "acute low back pain with bilateral sciatica, unspecified back pain laterally." Drvol adjusted Bunz' medication, gave him a steroid injection to decrease inflammation, and ordered an MRI of Bunz' lumbar spine based on Drvol's concern that Bunz might have "a bulging disc."

An MRI taken on October 18, 2017, showed mild loss of disc height at L4-5 with disc space desiccation and a broad-based central disc protrusion, demonstrating "caudal migration with associated annular tear." The disc protrusion "compress[ed] the origin of both L5 nerve roots along with the ventral margin thecal sac." At L3-4, the disc space demonstrated "a right foraminal/far lateral disc protrusion." There was "moderate right foraminal stenosis and compression of the transversing right L3 nerve root."

According to Bunz' trial testimony, "the work comp representative that they assigned [him]" recommended a chiropractor, and he received chiropractic adjustments on two occasions in November 2017, which did not provide any relief for his pain.

Drvol referred Bunz to orthopedic spine surgeon, Dr. John W. McClellan III, who examined Bunz on December 4, 2017. McClellan's notes from that visit state:

> [Bunz] [p]resents today with increasing pain present in the lower back and right buttock and hip with radiating symptoms in the posterior thigh. He indicates that his pain began

after a work-related injury on 10/13/2017. . . . He has been off work since 10/13/2017. . . . He rates his pain today at a 3 out of 10, best a 1 and worst an 8.

McClellan noted the failure of chiropractic care to provide relief, and he reviewed the October 2017 MRI. After examining Bunz, McClellan's diagnostic impression was "[l]umbago," "[t]ear of annulus fibrosis L4-5," "[b]ulging lumbar disc . . . L4-5," and "[p]ain in right leg secondary to annular tear with secondary neuropathic pain." McClellan restricted Bunz to light-duty work and instructed him to return in 1 month. McClellan also ordered physical therapy and adjusted Bunz' medication. McClellan provided a work release note, dated December 6, 2017, which stated, "No lifting over 15 lbs. No excessive or repetitive bending. Ability to change position as needed for comfort."

In testifying about this first visit with McClellan, Bunz indicated that in addition to recommending physical therapy and suggesting "shots," McClellan discussed the possibility of surgery. However, according to Bunz, McClellan informed him that he was too young for surgery. When asked about his attempts to schedule the recommended physical therapy and followup visit to McClellan, Bunz testified that he was unable to reach the "work comp adjuster."

Bunz informed A.C. Lightning of his light-duty work restriction and was paired with a new coworker. According to Bunz, after this individual was later fired, he then had to work by himself. Bunz did grounding and ladder climbing, and experienced a constant dull pain, which he rated as a 3 out of 10. Bunz worked for approximately 3 more months, all the while experiencing back pain. Bunz wanted to keep working for A.C. Lightning despite his back pain but ended up leaving due to his concerns about certain management changes, "discrepancies with the union," and other issues within the company.

Immediately after leaving A.C. Lightning, Bunz got a job driving a truck for 3 months. Bunz continued to have back pain while performing this work.

On May 26, 2018, Bunz tried to change the position of a solid wood desk located in his residence by turning it 90 degrees to face a different direction. Bunz estimated that the desk weighs 100 pounds. According to Bunz, while trying to turn the desk on the carpet, he "did a twisting motion, pushing it," felt "literally like a charley horse pull all the way down [his] back on [his] right side," and knew that he had done "something, like, major." Bunz testified that that he could not lift the desk at that time because that would have been "questionable." According to Bunz, he tried to slide it on the carpet, twisting in the process, which caused increased back pain. He had not thought moving the desk in this manner would cause a problem because he "used to push sleds . . . in football."

The following day, Bunz went to the emergency room, where he presented with back pain, reporting to emergency room personnel that he had "pulled something in [his] back lifting something heavy yesterday" and that the lifting was not work-related. He complained of "shooting pain" down his right leg. Bunz advised that he had a history of a herniated disc the previous year, that he had seen McClellen in the past for previous back pain, and that he had been sent to a chiropractor. Bunz was given pain medication in the emergency room and sent home with prescriptions for further medication.

A second MRI of Bunz' spine was taken on May 29, 2018, and when compared to the October 2017 MRI, it showed that the "broad-based central disc protrusion" at L4-5 was "slightly larger than on prior exam." The L3-4 "right foraminal/far lateral disc protrusion" had also "increased in size."

Bunz saw McClellan again on June 25, 2018. McClellan's notes from that visit state:

[Bunz] presents today for follow-up in relation to his work-related injury that occurred on 10/13/2017. . . . He was last evaluated in December 2017 at which time his complaints consisted of lower back and right hip pain. Today he notes lower back pain with radiating symptoms of bilateral lower extremity numbness and tingling. He rates his pain today to 4 out of 10, best a 1 and worst a 10. . . .

He had a lumbar MRI scan on 10/18/2017 which documented a central disc herniation and annular tear present creating moderate central canal stenosis at L4-5. He was asked to follow-up in 1 month. He was unable to make that visit.

[Bunz] reports he was seen 3-4 weeks ago in the ER for progressive symptoms in the right leg. He underwent an updated lumbar MR scan at that time.

After reviewing the May 2018 MRI results and examining Bunz, McClellan's diagnostic impression was "[l]umbago," "[p]arasthesia/numbness," and "[p]ain in right leg" with "[n]ew far lateral herniation L3/4 right side that was only a protrusion on the MRI in 2017." McClellan recommended an epidural injection, physical therapy, and instructed Bunz to return in 4 weeks. His work status note stated that Bunz could return to driving a truck but was to avoid heavy lifting. McClellan also restricted Bunz to light-duty work, with no lifting over 15 pounds, no excessive or repetitive bending, and the ability to change positions as needed for comfort. McClellan's notes from this visit do not show that he was advised of the desk moving incident. Bunz received a "[r]ight L3-4 [t]ransforaminal" epidural steroid injection on July 10.

Bunz returned to McClellan on August 1, 2018, with a chief complaint of low back pain, right buttock pain, and right inner thigh tingling. McClellan's notes from that visit state:

[Bunz] had a work injury in 20l7. He saw partial recovery and returned to work. The pain persisted but was tolerable until recently. Now the buttock and right thigh pain is not tolerable. He has been unable to work for the past few months.

We have trialed [sic] PT and an epidural with minimal relief.

McClellan's plan was to have Bunz underdo another steroid injection at a slightly different location, continue with a home exercise program, and "[c]onsider far lateral micro discectomy if the pain does not respond to the next two epidural injections." Again, McClellan's notes do not show that he was advised of the desk moving incident during that visit. In fact, the record reflects that McClellan was not advised of the desk-moving incident until the time of his November 2019 deposition. Bunz received another epidural steroid injection on September 6, which provided him relief for about 5 months.

Bunz was not working as a truck driver at that point, having had to quit that employment "just as soon as [he] was going through all that [presumably the increased pain following the desk-moving incident]." But, he was able to return to part-time light duty work with his brother,

helping with tasks like "screwing in drywall . . . or studs for framing," and Bunz was continuing to do this work "off and on" at the time of trial. Bunz continued to experience back pain at the time of trial. When the second epidural injection wore off, Bunz attempted to receive further treatment, but A.C. Lightning's workers' compensation carrier denied additional medical care, and Bunz' medical insurance provider denied liability for medical care because treatment was due to a workers' compensation injury.

There were several medical reports received into evidence at trial. In a report dated May 14, 2019, Drvol was asked to mark "YES" or "NO" in response to a series of questions. To the question of whether "[Bunz] became [his] patient as a result of an injury he reported to have suffered in the days before his appointment," Drvol marked "NO." In response to the other questions asked, Drvol affirmed that based upon the history provided to him, Bunz had experienced lower back pain, which radiated to the right leg, following Bunz' "return from work" the previous week; that after his examination of Bunz, he was concerned that Bunz may have suffered a disc injury, he administered a steroid injection, and referred Bunz for an MRI; that as a result of the 2017 MRI, he referred Bunz for a surgical consult; and that the treatment and referrals he provided to Bunz were necessary to address his lower back pain and radiculopathy.

McClellan responded to similar questions addressed to his treatment of Bunz in a report dated June 2, 2019. In the report, McClellan responded affirmatively with respect to questions about Bunz' history of experiencing lower back pain radiating into his right leg following a work accident in October 2017, and the differences between the 2017 and 2018 MRIs. McClellan also affirmed that the treatment he provided, physical therapy, and epidural steroid injections were necessary as a result of Bunz' work-related accident in October 2017, and that Bunz would need future medical care for those injuries. McClellan was not asked to respond to any questions relating to the desk-moving incident.

At A.C. Lightning's request, Dr. George M. Greene performed what he termed an "Independent Medical Examination" of Bunz on September 27, 2019. Greene reviewed Bunz' medical records and conducted a physical examination of Bunz. In his report, Greene noted both the work-related accident in October 2017 and the desk-moving incident of May 2018. In response to questions from A.C. Lightning, Greene diagnosed a right L3-4 far lateral disc herniation for the etiology of Bunz' right sided low back pain, radiating to the right leg with paresthesia. With respect to causation, Greene stated:

> [Bunz'] right-sided low back pain radiating to the right leg with paresthesias appear to represent an L3 radiculopathy, secondary to the right L3-L4 far lateral disc herniation that was causally related to the injury of [October 2017]. The right L3-L4 far lateral disc herniation was documented on the MRI of the lumbar spine performed on 10/18/17 and had increased in size on the MRI of the lumbar spine from 05/31/18.

Greene also stated:

> The right L3-L4 disc herniation appears causally related to the work injury of [October 2017]. There is no report of a pre-existing injury or condition to account for his complaint and the MRI findings. He subsequently experienced an injury while moving a desk that caused progression of the right L3-L4 far lateral disc herniation. [Bunz] was unable to work

at various times during his treatment, based on the work status notes in the available medical records with restriction to light duty.

Greene opined that Bunz had reached maximum medical improvement (MMI) "six months after the L3-L4 transforaminal epidural steroid injection performed on 09/06/18 or 03/06/19." Based on the "AMA Guides to the Evaluation of Permanent Impairment, Fifth Edition, Table 15-7," Greene assigned Bunz a permanent impairment rating of 7 % impairment of the whole person for "an unoperated lumbar disc herniation with residual symptoms." Greene recommended Bunz undergo a functional capacity evaluation to determine his work restrictions. Greene did not anticipate that Bunz would need any further medical treatment for injuries sustained in his October 2017 accident due to Greene's belief that Bunz had reached MMI.

The deposition of McClellan was taken on November 4, 2019. McClellan testified about his examination of Bunz in December 2017 and his review of the October 2017 MRI. He also testified about his examination of Bunz in June 2018, at which time McClellan was only advised that Bunz had been to the emergency room for progressive symptoms in the right leg. McClellan then described his review of the 2018 MRI in comparison with the 2017 MRI and discussed the previous report he provided to Bunz' attorney. At this point in the deposition, McClellan was given information about Bunz' desk-moving incident that led to his May 2018 trip to the emergency room (he was provided with a copy of Bunz' deposition testimony). McClellan responded affirmatively when asked if he thought it possible that the desk-moving incident caused progression of Bunz' previous disk protrusion. McClellan also agreed that the desk-moving incident could have caused a massive herniation. Based on his review of Bunz' deposition testimony, McClellan agreed that Bunz' need for treatment, beginning in June 2018, was more likely than not related to the desk-moving incident rather than the October 2017 work-related accident. And, McClellan responded affirmatively when asked if he could state within a reasonable degree of medical certainty that Bunz' "desk incident was and is a substantial contributing factor in his current need for treatment."

Upon cross-examination by Bunz' attorney, McClellan confirmed he did not believe that an individual of Bunz' size would have had difficulty in sliding a desk absent the original herniation at L3-4 and L4-5 with the annular tear. He agreed that the condition Bunz was in at the time he chose to move the desk was a "contributing factor," stating:

> Yes, I -- I mean, I see this as a -- the work-related injury is well documented. It's an injury. The scan documented in 2017 that he had a significant injury and aggravated essentially a degenerative condition, and then obviously he saw partial relief in it, and he aggravated it again in 2018.

McClellan affirmed that this was not an unusual sequence for someone with herniation at L3-4 and L4-5 with bilateral pain. When asked whether "the same occurrence could have . . . transpired" under circumstances besides trying to move a piece of furniture, McClellan stated, "Yeah, oftentimes the -- when the protrusion goes to a herniation, it's not a big lifting event. It's picking a sock up off the floor or helping to do something simple around the house." He also stated, "I

think it's fair to say that had he not had the injury in 2017, it's much less likely that he would have herniated larger in that location in 2018."

On redirect examination by A.C. Lightning's attorney, McClellan agreed that a person without an existing back injury could potentially injure themselves moving a 100-pound desk and suffer a disk herniation. McClellan was asked whether Bunz' current need for treatment related to the larger herniation that occurred in May 2018 as to opposed to the small protrusion indicated on the 2017 MRI. He responded:

> I would say the ongoing treatment is going to be a little of both, meaning that the work-related injury really never went away, and the moving the desk seemed to have caused the larger herniation, but I -- this is one of those typical scenarios where patients that have mild pain live with it, and it looks as if moving the heavy desk was one of the major factors of causing the herniation in the location of where he had his work herniation.

In explaining why he believed the desk-moving incident was "a major factor in the cause of the larger herniation," McClellan stated:

> Just the imaging reports, and we -- we could not see exactly what he injured from before. And it's not a simple thing to treat. He has the tear at L3-4 with a herniation or protrusion; he has nerve compression both sides at L4-5.
>
> And so the MRI showed -- and I don't believe we ordered that MRI. I believe it was ordered by somebody else, but the MRI showed that it -- the herniation in the area of the work-related injury got larger. It was after his reported incident of moving the desk.

McClellan was also asked whether the deposition testimony he reviewed also indicated that the desk-moving incident was a major factor in causing the larger herniation. McClellan responded:

> The -- it's a contributing factor. Its -- again, when you -- when you tear a disc or you have an annular bulge or herniation, you're a real setup for quite a while. I know because I have one in my back. Your back is much more sensitive, you're much more prone to herniations in the future.
>
> So by the patient's own report, moving the desk was kind of the needle that broke the camel's back. It was the last -- the last piece of straw that kind of dumped the cart.
>
> And so all we can say is the actual herniation occurred after moving the desk by report, and it occurred in the area of his prior work-related injury. I'm not sure, it's very difficult to say did the work-related injury set him up so close that it didn't take much to cause a herniation or -- you know, I'm not sure that I can say with confidence moving the desk was the sole reason for the herniation, or that the work-related was the sole reason. It's -- unfortunately they both occur in the same location.

Finally, on recross-examination, when asked whether he believed that it was "the combination of the events" that resulted in the herniation, McClellan responded:

> Yes. I think that's clearly drawn out by the two MRI scans that really nicely document beyond anybody's opinion on a -- the work injury was in that location, and then

moving the desk created or -- again, the herniated disc occurred after moving the desk in the same location as the work-related injury.

On December 4, 2019, the compensation court entered an award of benefits to Bunz. After setting forth a detailed recitation of the evidence, the court found no doubt that Bunz suffered a work-related back injury in October 2017. The court then discussed relevant case law in addressing A.C. Lightning's argument that the May 2018 desk-moving incident was an independent intervening cause cutting off its liability for any subsequent treatment after the date of that incident. The court concluded McClellan's deposition showed that the October 2017 work-related accident and the May 2018 desk-moving incident were both causes of Bunz' need for further treatment. The court stated, "The accident at work on October 12, 2017, set up [Bunz] for further injury to his back by doing simple tasks around the home, such as picking up a sock or moving a desk." The court noted that Bunz' actions in moving the desk were not "rash acts or conduct." The court stated further, "Here, [Bunz] was not performing a rash or unreasonable act. He simply pushed and twisted when moving the desk." The court found that Bunz' October 2017 work-related injury caused or contributed to his need for further treatment, stating, "Once an employee suffers an injury, the employer is liable for further injury and the need for treatment as a result of reasonable, ordinary activities of life."

The compensation court found that Bunz was entitled to temporary total disability benefits from October 13, 2017, to December 4, 2017, and from May 27, 2018, through the date of trial "and for so long in the future as [he] will remain entitled to temporary total benefits." The court ordered A.C. Lightning to pay certain medical bills, and it found that Bunz was entitled to future medical care and to be treated by McClellan. The court found that Bunz was not at MMI and that it was premature to determine his permanent benefits and right to vocational rehabilitation services. Finally, the court gave A.C. Lightning credit for all payments made to Bunz.

## ASSIGNMENTS OF ERROR

The Appellants assert, reordered, that the compensation court erred in (1) awarding future medical care to Bunz and (2) awarding temporary total disability benefits from October 13 to December 4, 2017, and from May 27, 2018, to November 8, 2019.

## STANDARD OF REVIEW

A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Picard v. P & C Group 1*, 306 Neb. 292, 945 N.W.2d 183 (2020).

On appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Id.* In testing the sufficiency of the evidence to support the findings of fact in a workers' compensation case, an appellate court considers the evidence in the light most favorable to the

successful party, every controverted fact must be resolved in favor of the successful party, and the appellate court gives the successful party the benefit of every inference reasonably deducible from the evidence. *Aboytes-Mosqueda v. LFA Inc.*, 306 Neb. 277, 944 N.W.2d 765 (2020). In workers' compensation cases, an appellate court determines questions of law. *Picard v. P & C Group 1, supra*.

As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of witnesses and the weight to be given their testimony. *Aboytes-Mosqueda v. LFA Inc., supra*.

ANALYSIS

*Future Medical Care.*

The Appellants assert that the compensation court erred in awarding future medical care to Bunz. They argue that Bunz' decision to move the desk in May 2018 was rash in light of his knowledge of his condition and that the desk-moving incident contributed significantly to Bunz' current disabling condition. They argue that, in finding a causal connection between the 2017 accident and injury and the 2018 incident, the court incorrectly determined that the 2018 incident had to be the sole cause of Bunz' current disability in order to cut off A.C. Lightning's liability for future medical care. The issue presented by the Appellants' arguments is whether Bunz' ongoing symptoms after the May 2018 desk-moving incident are causally related to the October 2017 accident and injury, making A.C. Lightning responsible for the payment of benefits, or whether the May 2018 incident constituted an independent intervening cause, relieving A.C. Lightning of liability. In other words, are Bunz' ongoing symptoms due to an aggravation or a recurrence of the 2017 injury.

Where there have been two accidents to an employee, the question of whether the disability sustained by him should be attributed to the first accident or to the second accident depends on whether or not the disability sustained was caused by a recurrence of the original injury or by an independent intervening cause. *Mendoza v. Omaha Meat Processors*, 225 Neb. 771, 408 N.W.2d 280 (1987). If the second injury is but a recurrence of the original injury, compensation therefor must be paid by the employer and insurance carrier at the time of the first injury. *Id.*

In order to recover under the Nebraska Workers' Compensation Act, a claimant has the burden of proving by a preponderance of the evidence that an accident or occupational disease arising out of and occurring in the course of employment proximately caused an injury which resulted in disability compensable under the act. *Hintz v. Farmers Co-op Assn.*, 297 Neb. 903, 902 N.W.2d 131 (2017).

In workers' compensation cases, an independent intervening cause, as the proximate cause of an injury, is, generally, a matter of defense and, as such, must be proved by the party asserting that defense. *Fentress v. Westin, Inc.*, 304 Neb. 619, 935 N.W.2d 911 (2019). The mere possibility of an independent intervening cause does not relieve an employer from liability for an employee's otherwise compensable claim for workers' compensation and benefits. *Id.* A defendant asserting a break in causation by an independent intervening cause must prove the break in causation by competent medical testimony if the claimed injuries are of such a character that scientific testimony is required to prove their validity. *Id.* Along with causation, the issue of whether the claimant has

sustained a permanent impairment, and the extent of impairment, are questions of fact. *Green v. Drivers Mgmt., Inc.*, 263 Neb. 197, 639 N.W.2d 94 (2002).

In its award of benefits to Bunz, the compensation court relied on *Mendoza v. Omaha Meat Processors, supra*, wherein the Nebraska Supreme Court, quoting 4 Arthur Larson, The Law of Workmen's Compensation §§ 95.22 and 95.23 (1987), stated:

"There is . . . a fine line separating aggravations from recurrences. . . .

"In order to find that there has been an aggravation, it must be shown that the second episode contributed independently to the final disability. Also, there must have been a second 'injury' as that term is used in the jurisdiction. . . .

"If the second injury takes the form merely of a recurrence of the first, and if the second incident does not contribute even slightly to the causation of the disabling condition, the insurer on the risk at the time of the original injury remains liable for the second. . . . This group . . . includes the kind of case in which a worker has suffered a back strain, followed by a period of work with continuing symptoms indicating that the original condition persists, and culminating in a second period of disability precipitated by some lift or exertion."

225 Neb. at 782, 408 N.W.2d at 287.

The compensation court also relied on *Doty v. Aetna Life & Casualty*, 217 Neb. 428, 350 N.W.2d 7 (1984), wherein the Nebraska Supreme Court, quoting 1 Arthur Larson, The Law of Workmen's Compensation §§ 13.11 (1982), stated:

"Moreover, once the work-connected character of any injury, such as a back injury, has been established, the subsequent progression of that condition remains compensable so long as the worsening is not shown to have been produced by an independent nonindustrial cause. This may sound self-evident, but in close cases it is sometimes easy to overlook this essentially simple principle. In a Utah case, claimant had suffered a compensable accident in 1966, injuring his back. Several years later, this condition was triggered by a sneeze into a disc herniation, for which claimant required surgery. The medical testimony was that because of the back condition, it was probable that had claimant not had the sneezing episode, some other major or minor event would have eventually necessitated surgery. The finding that the sneezing episode was the independent cause of claimant's disability, and the resultant denial of compensation, were held to be error, and benefits were awarded on appeal. This result is clearly correct. The presence of the sneezing incident should not obscure the true nature of the case, which is nothing more than that of a further medical complication flowing from a compensable injury. If the herniation had occurred while claimant was asleep in bed, his characterization as a mere sequel to the compensable injury would have seemed obvious. This case should be no different if the triggering episode is some nonemployment exertion like raising a window or hanging up a suit, so long as it is clear that the real operative factor is the progression of the compensable injury, associated with an exertion that in itself would not be unreasonable in the circumstances. A different

question is presented, of course, when the triggering activity is itself rash in the light of claimant's knowledge of his condition."

217 Neb. at 432-33, 350 N.W.2d at 9-10.

In the present case, it is undisputed that Bunz suffered a work-related accident and injury to his back in October 2017. Bunz has suffered ongoing back pain since that time. It is also undisputed that Bunz suffered an increase in the size of the disk herniations he previously suffered in 2017 following the May 2018 desk-moving incident and continued back pain. The compensation court read McClellan's deposition to show that both the October 2017 work-related accident and the May 2018 desk-moving incident were causes of Bunz' need for further treatment, that the 2017 accident set up Bunz for further injury by performing simple tasks around his home, that Bunz' actions in moving the desk were not rash, and that the 2017 accident and injury contributed to Bunz' need for further treatment.

The compensation court's award of future medical benefits is supported by McClellan's testimony, who opined in his deposition that absent the original disk herniations and annular tear, it would have been unlikely for someone like Bunz to have had difficulty in sliding a desk and that absent the 2017 injury, the occurrence of the larger herniations in 2018 would have been much less likely. He indicated that given Bunz' 2017 injury, the same result (increased size of disk herniations) could have occurred through any number of simple household activities. McClellan also testified that the work-related injury really never went away and that the injuries from both incidents were in the same location. This evidence supports the conclusion that the 2018 herniations were a recurrence of the 2017 work injury and that the Appellants failed to prove a break in causation between the two incidents or that the second incident contributed independently to the final disability.

If the record contains evidence to substantiate the factual conclusions reached by the trial judge of the compensation court, an appellate court is precluded from substituting its view of the facts for that of the compensation court. *Eddy v. Builders Supply Co.*, 304 Neb. 804, 937 N.W.2d 198 (2020). And, to the extent there were conflicts within McClellan's testimony, resolving conflicts within a health care provider's opinion rests with the compensation court, as the trier of fact. *Damme v. Pike Enters.*, 289 Neb. 620, 856 N.W.2d 422 (2014). Because there was sufficient evidence to support the court's decision that the May 2018, injury was a recurrence of the October 2017, injury, we must affirm the compensation court's award of future medical benefits.

*Temporary Total Disability.*

The Appellants argue that Bunz' attorney admitted on the record that Bunz was not seeking temporary total disability benefits through the date of the trial and that because of this "stipulation," the compensation court erred in awarded temporary total disability benefits from October 13 to December 4, 2017, and from May 27, 2018, to November 8, 2019. Brief for appellants at 14. We disagree with the Appellants' reading of the exchange that occurred at the start of trial. The parties referenced exhibit 15 during this discussion with the court. Exhibit 15 is a summary of benefits sheet, showing the benefits that had been paid so far by A.C. Lightning, including 7 4/7 weeks of temporary total disability for the period from October 13 to December 4, 2017. The court inquired

as to whether "temporary is all paid," and Bunz' attorney responded by stating "[t]o this point." Bunz suggests that this statement by his counsel was an inadvertent mishandling of the facts regarding what benefits had been paid and was not a stipulation. We agree. The parties' pleadings show that temporary total disability was in dispute. Exhibit 15 reflected the temporary total disability payments had been made prior to trial. And, clearly, the court interpreted the response by Bunz' attorney in the context of the entire record, including Bunz' trial testimony and the exhibits received. The court gave A.C. Lightning credit for all payments already made, so A.C. Lightning is not being ordered to make a double payment. A.C. Lightning does not otherwise argue that Bunz was not temporarily totally disabled from May 27, 2018, through at least the time of trial. This assignment of error fails.

CONCLUSION

The compensation court did not err in awarding Bunz future medical care and temporary total disability benefits. The judgment of the compensation court is affirmed.

AFFIRMED.